[No. 11175-0-III.    Division Three.    June 2, 1992.]

DIANE MCKENNA, *Individually and as Personal Representative*, ET AL, *Respondents*, v. DANIEL DUANE EDWARDS, ET AL, *Petitioners*.

906

*Gerald R. Neal* and *Preston Thorgrimson Shidler Gates & Ellis; Howard M. Nichols,* for petitioners.

*James P. Connelly, Robert A. Dunn,* and *Winston & Cashatt,* for respondents.

SWEENEY, J. — Sharon Pfennig was raped and her boyfriend, Kipper McKenna, was killed by Daniel Edwards while Edwards was free on his own recognizance pending arraignment on other charges. Diane McKenna, as personal representative for the estate of Kipper McKenna, and Sharon Pfennig and her parents (McKennas) brought this action against Edwards, the County of Spokane, Northeast Washington Treatment Alternatives d/b/a Treatment Alternatives To Street Crime and Substance Abuse Assessment and Monitoring, and John and Jane Does 1 through 6 alleging negligence in releasing Edwards and in monitoring him while he was free pending arraignment.[1]

---

[1] By stipulation of the parties, John and Jane Does 2 and 5, Spokane District Court Judge Madden and Spokane County Prosecutor Paul Mack and their wives, were dismissed from the action. John and Jane Does 3 and 6 are Spokane County Corrections Officer Art DeFelice and Treatment Alternatives to Street Crime employee Al Barrett and their wives. John Does 1 and 4 are not identified in the complaint nor are any acts of negligence assigned to them.

Spokane County and its corrections department officer Art DeFelice (Corrections) and Northeast Washington Treatment Alternatives and its employee Al Barrett (TASC) moved for summary judgment. The court granted Corrections' motion for summary judgment for Corrections' investigation and recommendation to the court to release Edwards pending arraignment on the basis of judicial or prosecutorial immunity. The court denied both Corrections' and TASC's summary judgment motions for postrelease activities. All parties moved for discretionary review of the court's order. We accepted review, affirm the trial court's granting of Corrections' motion for summary judgment for prerelease activity, reverse the denial of Corrections' and TASC's motions for summary judgment for postrelease activities and dismiss.

## FACTUAL BACKGROUND

On June 19, 1987, Daniel Edwards, age 20, was arrested in Spokane and charged with one count of second degree rape and one count of third degree statutory rape of a 15-year-old girl. According to the affidavit supporting the arrest warrant, Edwards had used marijuana on the evening of the rape.

Following his arrest for the rape charges, Corrections investigated Edwards to assist the court in determining whether and on what conditions Edwards should be released pending arraignment. Corrections learned that with the exception of a 7-month period, Edwards had resided with his parents and brother for his entire life; his aunt and uncle lived in the community; and Edwards was unemployed. Corrections verified that his residence was with his mother. She confirmed that Edwards lived with her and could return home pending arraignment but she refused to be responsible for his actions. She told Corrections her son had a drug problem for which he had been treated. Edwards had six prior juvenile convictions for burglary or theft. However, he previously had been released on his own recognizance and had no history of warrants. Based

on this information, Corrections made the following recommendation to the court:

> Defendant has adequate community and family ties. He is currently unemployed and supported by his parents. He has an extensive felony record with six convictions for burglary or theft. It appears that no warrant history is evident. Defendant appears to be a reliable person to return to court and OR is recommended subject to release conditions.
>
> [OR Recommended.]

On June 19, the court released Edwards on his own recognizance pending arraignment, subject to the following conditions: (1) weekly contact with the corrections department; (2) travel outside Spokane County in excess of 48 hours prohibited without the corrections department's permission; (3) no possession of firearms/dangerous weapons; (4) no contact with the victim; (5) no consumption of alcoholic beverages; (6) report to TASC on June 22 for biweekly drug and alcohol monitoring; (7) maintain a 10 p.m. curfew; (8) no consumption or possession of nonprescribed drugs; (9) no further criminal violations; and (10) reside with his parents.

On June 22, Corrections informed TASC of the charges against Edwards, his release, and the requirement that he report to TASC for drug monitoring. Edwards failed to keep his first appointment with TASC (June 22). TASC informed Corrections of Edwards' failure to report. Corrections said it would "rattle his cage". On June 23, Edwards reported to TASC. In response to a request for intake information, Edwards informed TASC he had been using marijuana/hash and alcohol three or more times a week during the previous 90 days, most recently on June 18 (5 days prior to first testing by TASC). After completing the screening and intake forms, Edwards submitted to a urinalysis test.

Edwards reported to TASC on June 25 for a breath analysis and again on June 29 for urinalysis. On June 30, TASC received a positive test result for marijuana from the June 23 urinalysis. A TASC employee immediately called Corrections to report the results. Unable to reach the Corrections officer, the TASC employee left a message reporting the test

results. TASC also prepared a monthly progress report on Edwards and sent it to Corrections the next day (July 1). On July 1, Corrections sent a report entitled "Felony Pre-Trial Release Supervision Delinquency" to the prosecutor informing him of the positive test results for marijuana and also informing him:

> Our concern at this time is to make you aware of this delinquency. We leave it to your discretion as to whether a revocation of release or other appropriate action is in order.

Also, on July 1 TASC received the results of Edwards' June 29 urinalysis; they were negative.

When Edwards reported to TASC on July 2, it confronted him with the positive results from the June 23 urinalysis. Edwards denied using marijuana since June 18, which was 5 days before his drug monitoring program began. The prosecutor called TASC to discuss the positive test results. TASC informed the prosecutor that based on its experience and understanding of the literature, the time period for THC (active ingredient in marijuana) to be eliminated from the system, at the rate Edwards used marijuana, is 5 days. It therefore was possible that the positive results from the June 23 test could have resulted from marijuana use on June 18 (the day prior to Edwards' arrest). TASC also told the prosecutor the test results from June 25 and June 29 were negative. The prosecutor told TASC that Edwards was dangerous and requested that TASC immediately notify him of any future problems.

Edwards' urinalysis results from the July 2 test were negative, as were breath analysis results of July 6. Both his July 9 urinalysis and the July 13 breath analysis were negative.

On July 14, Edwards attended a "kegger" party together with Kipper McKenna, his lifelong friend, and Sharon Pfennig, Mr. McKenna's girlfriend. Edwards asked Ms. Pfennig for a ride to his cousin's home. She agreed, but requested that Mr. McKenna accompany them. During the trip, Edwards shot Mr. McKenna, without warning, and raped

Ms. Pfennig. Edwards was charged with first degree aggravated murder and first degree rape. He confessed to both crimes. Ms. McKenna and the Pfennigs filed this civil action.

## ISSUES

The questions presented are (1) whether Corrections' investigation and recommendation to release Edwards is shielded from liability because of judicial immunity; (2) whether the relationship between Corrections or TASC and Edwards imposes a duty on either agency to anticipate and control Edwards' conduct; and (3) whether either Corrections or TASC breached a duty owed to McKennas.

## STANDARD OF REVIEW — SUMMARY JUDGMENT

■ The issues raised in this appeal were resolved by summary judgment at the trial court. We therefore engage in the same inquiry as the trial court, considering all facts and reasonable inferences therefrom in the light most favorable to the nonmoving parties. *Taggart v. State*, 118 Wn.2d 195, 199, 822 P.2d 243 (1992).

## JUDICIAL IMMUNITY

McKennas contend the court erred in concluding Corrections' investigation and recommendation to the court to release Edwards is protected by judicial immunity.

■ Corrections' investigation was done pursuant to former JCrR 2.09, which provided that a defendant "shall" be released on his personal recognizance unless the court determines his release will not assure his appearance. Additional conditions may be imposed only if the court finds the defendant may not appear or if he poses a danger to himself or others. Former JCrR 2.09(c). This rule implements a societal policy which recognizes liberty as the norm; as such, due process requires pretrial release unless the State can show by clear and convincing evidence the defendant presents an identifiable and articulable threat. *United States v. Salerno*, 481 U.S. 739, 750, 755, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987).

■ Here, Corrections serves as an arm of the court when it investigates and makes a recommendation to the court. In so doing, it performs functions traditionally performed by the court. We hold that its role, acting as an arm of the court, is the kind of activity granted immunity in this state. *Taggart*, at 213; *Noonan v. State*, 53 Wn. App. 558, 769 P.2d 313, *review denied*, 112 Wn.2d 1027 (1989); *Tobis v. State*, 52 Wn. App. 150, 758 P.2d 534 (1988); *Bader v. State*, 43 Wn. App. 223, 716 P.2d 925 (1986). The trial court's order granting Corrections' motion for summary judgment as to the prerelease investigation and recommendation was proper.

## DUTY

We next address whether the court erred in finding a question of fact existed as to whether Corrections or TASC, or both, had a duty to control Edwards' conduct following his release.

■■ In a negligence action, a defendant must owe a duty of care to the plaintiff, the breach of which is a proximate cause of the plaintiff's injuries. *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985). The existence of a duty is a question of law. *Taylor v. Stevens Cy.*, 111 Wn.2d 159, 168, 759 P.2d 447 (1988). The concept of duty turns on foreseeability and policy considerations. *Bailey v. Forks*, 108 Wn.2d 262, 266, 737 P.2d 1257, 753 P.2d 523 (1987). "Legal causation . . . rests on policy considerations as to how far the consequences of defendant's acts should extend. It involves a determination of whether liability *should* attach as a matter of law given the existence of cause in fact." *Hartley*, at 779.

McKennas contend that the court's order releasing Edwards and requiring that he contact Corrections weekly created a special relationship which required it to control Edwards' conduct. Corrections contends the trial court's denial of its summary judgment motion as to postrelease activities was error because Edwards was not subject to the control or supervision of Corrections. TASC contends the

trial court's denial of its motion for summary judgment was error because its only duty was to monitor Edwards' drug and alcohol use and report the results to Corrections. TASC further maintains it was not put on notice by either Edwards' conduct or his record of a propensity to commit rape and murder.

McKennas rely on two sections of Restatement (Second) of Torts (1965) to support their position that both Corrections and TASC had a duty to control Edwards. The first, section 315, states:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, . . .

The second, section 319, provides:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

Our review of Washington decisions leads us to the conclusion that the relationship between Edwards and Corrections and Edwards and TASC is not the special relationship contemplated in either section 315 or section 319 of the Restatement.

Although Washington courts have imposed liability for the failure to control or supervise the conduct of a third person, the common thread of those decisions is either (i) a statutory mandate, or (ii) specific knowledge about the third person which warranted imposition of a duty to act — or both.

In *Petersen v. State*, 100 Wn.2d 421, 671 P.2d 230 (1983), a woman was injured by an automobile driven by a patient who had been released 5 days earlier from a state mental hospital. She sought damages from the State, claiming that the attending state psychiatrist should not have permitted the patient's release.

As a condition of probation for a burglary conviction, the patient had been ordered to participate in mental health counseling and refrain from using controlled substances. After cutting out his left testicle, the patient was admitted to Western State Hospital for a 72-hour involuntary detention. As a resident of the hospital, he was under its direct, custodial control.

The patient told his treating psychiatrist that he had taken "angel dust" prior to the emasculation incident. *Petersen*, at 423. The psychiatrist diagnosed the patient as having " 'schizophrenic reaction, paranoid type with depressive features' ", due primarily to the use of "angel dust". *Petersen*, at 423. Because the patient was "gravely disabled" and "presented a likelihood of serious harm to himself", the psychiatrist filed a petition requesting authority to detain the patient for 14 days. *Petersen*, at 424.

The inpatient treatment continued for an additional 14 days. The psychiatrist allowed the patient a home visit. When the patient returned to the hospital, he was apprehended by security guards for spinning his car in circles on hospital grounds. Despite this conduct, the patient was released the following morning. The accident occurred 5 days later.

The court held the treating psychiatrist had failed to exercise his statutory authority under RCW 71.05.280. That statute allowed him to seek a 90-day involuntary commitment of the patient in the hospital's control, care and custody. Relying on section 315, the court concluded that a "special relationship" existed between the psychiatrist, employed at the state mental hospital, and his known-to-be-dangerous patient. The relationship established a duty of reasonable care in favor of the party injured by the patient. *Petersen*, at 426-29.

The psychiatrist in *Petersen* knew that his patient had engaged in self-mutilation by emasculating himself while using "angel dust"; he diagnosed the patient as schizophrenic, and originally requested the 14-day detention. Because the patient in *Petersen* was under the care, custody

and control of the hospital, the doctor had statutory authority to further confine him.

In *Bader v. State, supra*, the court found a question of fact existed as to the foreseeability of a patient harming his neighbor and the action a mental health clinic should have taken. In contrast to the facts presented here: (1) the mental health center in *Bader* had an ongoing treatment relationship with the patient for almost 6 months; (2) the treatment was based on the patient's acquittal by reason of insanity for assaulting his mother with a board; (3) the center's records contained a copy of the court order stating the patient was a substantial danger to others and likely to commit felonious acts jeopardizing public safety; (4) the center was aware the patient was not taking his medication, as required by the court order, missing appointments, stating he saw the devil in people and he must kill the devil; and (5) family members felt threatened by his behavior.

Similarly, in *Bailey v. Forks, supra*, a police officer allowed an individual he knew to be intoxicated to drive. By statute, the officer was required to arrest him. RCW 70.96A.120(2). He failed to do so and the plaintiff was injured when struck by the drunk driver. The court reversed a summary judgment dismissing the action holding that a duty existed when: (1) government agents responsible for enforcing statutory requirements possess actual knowledge of a statutory violation, (2) they fail to take corrective action despite a statutory duty to do so, and (3) the plaintiff is in the class the statute intended to protect. *Bailey*, at 268.

Recently, in a consolidated case, *Taggart v. State*, 118 Wn.2d 195, 822 P.2d 243 (1992), the court found the existence of a duty. There, two parolees were subject by statute to the supervision of parole officers. RCW 72.04A.080. The parole officers were required to "give . . . *supervision* . . . within the conditions of a parolee's release from custody". (Italics ours.) RCW 72.04A.080.

In *Taggart*, the parolee had a history of violent assaults, rape and alcohol abuse, all of which was known to the

parole officer. *Taggart*, at 199, 200. His parole officer had recommended approval of a preparole referral plan subject to special conditions including a requirement that the parolee complete a substance abuse program and submit to urinalysis testing. Following the parolee's release, his parole officer did not require further counseling or periodic urinalysis; nor did she attempt to contact his employer or girlfriend. *Taggart*, at 200. Seven months after his release, the parolee went to a bar, socialized briefly with Ms. Taggart, demanded, a ride and then attacked her. *Taggart*, at 201.

In *Sandau v. State* (consolidated with *Taggart*), the parolee was also under a statutorily mandated *supervision* of a parole officer. *Taggart*, at 201. The parolee had been serving a sentence for an assault in which he had stabbed a man in the chest. Successive parole officers had information that the parolee was drinking, not residing or working with his brother (a condition of his parole), threatening his ex-wife's husband, beating his girlfriend and her children, and bragging about his crimes and status as a parolee. *Taggart*, at 201-02. Despite this information, there was a lack of follow up on the reports and a delay in issuing a "fast entry" warrant for his arrest. While free, the parolee repeatedly raped a 9-year-old boy.

The facts here are distinguishable from the above cited decisions. Edwards had not been convicted of the crime of statutory rape; he was presumed innocent. He had a right to be free pending arraignment under the least restrictive conditions possible. Former JCrR 2.09. In *Taggart*, both parolees were convicted criminals on supervised parole. They were not entitled to a presumption of innocence nor did they have a right to be free. *United States v. Salerno*, 481 U.S. 739, 750, 755, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987).

Here, there is neither a statutory mandate nor any special knowledge which would warrant imposition of a duty on Corrections or TASC to control Edwards. Corrections' duty was limited to (1) insuring that Edwards reported weekly to the department, and (2) reporting any violations of the

pretrial release order to the prosecutor. That duty was met when Corrections notified the prosecutor of Edwards' positive urinalysis test results for June 23. The court's pretrial release order expressly limited TASC's role to monitoring alcohol and drug use. We reject McKennas' argument that TASC had the authority and therefore the obligation to evaluate Edwards' potential danger to others or to require him to enter treatment. This was the court's responsibility.

Unlike *Petersen*, *Bailey*, and *Taggart*, the statutory mandate here was to release Edwards, pending arraignment, under the least restrictive conditions which would assure his appearance. The court could have required that Edwards remain under the supervision of "an officer of the court . . .". Former JCrR 2.09(c)(4). It did not.

Moreover, other than the failure of the initial urinalysis, there was no knowledge by either Corrections or TASC which would warrant imposition of a duty to control the conduct of Edwards. When viewed in a light most favorable to McKennas, the evidence here is that Edwards was a drug and alcohol abuser. Both the prosecutor and the court, however, were aware of this when Edwards was released on his own recognizance. Specific conditions were imposed as a condition of his release to address the problem of drug and alcohol abuse. Even if we assume the prosecutor and the court were unaware of Edwards' drug abuse or the recency of that abuse, there is still no showing that his release would have been revoked. Except for the present charge, there was nothing in Edwards' criminal history which would portend murder and rape. *Noonan v. State*, 53 Wn. App. 558, 566, 769 P.2d 313, *review denied*, 112 Wn.2d 1027 (1989); *Baumgart v. Grant Cy.*, 50 Wn. App. 671, 676-77, 750 P.2d 271, *review denied*, 110 Wn.2d 1033 (1988).

McKennas contend that TASC may have assumed a duty to supervise by checking a block on their intake form entitled "Pre-trial supervision". Brief of Respondent/Cross Appellant, appendix 4. We disagree. There is no evidence the court intended that TASC supervise Edwards nor is there any evidence TASC assumed that responsibility.

We hold that Corrections and TASC had no duty to anticipate and therefore control Edwards' conduct. Corrections' duty was to monitor and inform the prosecutor and the court. TASC's duty was to perform drug testing and report. We decline the invitation to extend those duties to include supervision and control. It would be anomalous to require Corrections and TASC to continue release under "the least restrictive conditions" and then impose a duty (with 20/20 hindsight) because they were not sufficiently restrictive. The restrictions were imposed by the court following a hearing.

Here, there is no order to supervise, no statute which would mandate supervision and no agreement to supervise. While it is true that this tragedy would not have occurred if Edwards had been incarcerated pending arraignment, this cause in fact, standing alone, does not provide the basis for the "legal causation" which is the very heart of a legally cognizable duty. *Bailey v. Forks,* 108 Wn.2d 262, 266, 737 P.2d 1257, 753 P.2d 523 (1987).

In any event, TASC's responsibility would have been to notify Corrections whose responsibility it was, in turn, to notify the prosecutor. Here, the prosecutor had already come to the conclusion Edwards was dangerous. His directions to TASC were to notify him of any future problems. Hindsight may be a more accurate gauge of human conduct, but it should never be the basis for imposition of a legal duty.

We affirm the court's summary judgment as to Corrections' pretrial release conduct based on judicial immunity. We reverse the court's denial of Corrections' and TASC's motions for summary judgment based on their postrelease conduct and dismiss the complaint.

SHIELDS, C.J., and MUNSON, J., concur.

Review denied at 120 Wn.2d 1003 (1992).