979 P.2d 400 (1999)
138 Wash.2d 265
John HERTOG, guardian ad litem and on behalf of S.A.H., a minor, Respondent,
v.
CITY OF SEATTLE and King County, Petitioners.
No. 66136-7.
Supreme Court of Washington, En Banc.
Argued November 17, 1998.
Decided June 24, 1999.
*403 Harbaugh & Bloom, Gary N. Bloom, Debra Stephens, Daniel E. Huntington, Spokane, amicus curiae on behalf of Washington State Trial Lawyers Ass'n.
Allen, Hansen & Maybrown, Todd Maybrown, Christine Lamson, Seattle, amicus curiae on behalf of Northwest Women's Law Center.
Gordon, Thomas & Honeywell, John R. Connelly, Jr., Tacoma, amicus curiae on behalf of Family and Friends of Violent Crime.
Marcia M. Nelson, Asst. City Atty., Norm Maleng, King County Pros., Charles C. Parker, Deputy, Seattle, for Petitioner.
Janet L. Rice, Seattle, for Respondent. *401
*402 MADSEN, J.
In Taggart v. State, 118 Wash.2d 195, 822 P.2d 243 (1992), we held that a state parole officer has a duty to protect others from reasonably foreseeable danger resulting from the dangerous propensities of parolees. At issue in this case is whether a similar duty exists on the part of a city probation counselor and a county pretrial release counselor. We conclude that a duty exists in each situation, and that material issues of fact preclude summary judgment. Further, materials sought by plaintiff concerning treatment for sexual deviancy and substance abuse are discoverable under the facts here. The Court of Appeals is affirmed.

FACTS
On October 6, 1990, Barry Lee Krantz raped six-year-old S.A.H. in her home. At the time, Krantz was on Seattle Municipal Court probation for a 1989 lewd conduct conviction. He was also on pretrial release while awaiting King County charges on a 1990 sexually motivated burglary. In this negligence action brought against both the City of Seattle (City) and King County (County), John Hertog,[1] as guardian ad litem for S.A.H., contends that the city probation counselor and the county pretrial release counselor negligently supervised Krantz, and this negligence proximately caused the rape. The individual counselors are not being sued.
Both the City and the County moved for summary judgment arguing they had no duty to protect others from foreseeable danger posed by Krantz. Their motions were denied. The Court of Appeals granted interlocutory discretionary review and affirmed the rulings denying summary judgment. That court also agreed with plaintiff's claim that the trial court incorrectly denied plaintiff's motion to compel the City to provide discovery of Krantz's treatment records for substance abuse and sexual deviancy. The following are facts relating to the asserted liability of the City and the County, respectively.
Plaintiff alleged in the complaint that the City and its employee, probation counselor Mr. Hoover, negligently supervised Krantz while he was on probation and this negligence led to the rape.[2]
*404 Krantz has a history of substance abuse and offenses involving sexual deviancy. Krantz was convicted of lewd conduct in 1980, 1987, and twice in 1989. Hoover was his probation counselor for the 1987 offense and one of the 1989 offenses. Krantz's offenses occurred while he was under the influence of drugs and alcohol. Following the 1987 conviction his 90-day sentence was suspended on condition that he attend and complete a drug-alcohol program. During an evaluation for the program, Krantz told the evaluator he had exposed himself to approximately 400 women. The evaluator described Krantz's deviancy as predatory, premeditated and compulsive, noting he showed little remorse or empathy with his victims. The evaluator described him as a "poly drug abuser" and said that Krantz's drug use was a "disinhibitor" which "impair[ed] judgment and weaken[ed] controls." Clerk's Papers (CP) at 445. Treatment and testing procedures were recommended. Krantz violated probation conditions many times, including failing to participate in treatment, substance abuse, and exposing himself on several occasions in May 1988. The treatment facility informed Hoover of the violations, and recommended court review. Following a court hearing, additional probation conditions were imposed, including drug treatment. Krantz again violated conditions of probation, and his probation was revoked and he was sentenced to 20 days in jail.
While on probation for the 1987 conviction, Krantz committed another lewd conduct offense for which the Bellevue District Court sentenced him in February 1989 to a year in jail, suspended on condition he attend and complete an in-patient sexual deviancy program, attend Alcoholics Anonymous (AA) meetings, and consume no drugs. Krantz failed to meet with his Bellevue probation counselor, and a bench warrant was issued. Also, he committed another lewd conduct offense, involving following a woman to her apartment building, and exposing himself and masturbating after she had shut the glass entrance door to the building behind her and turned to look at him. Krantz pleaded guilty to this lewd conduct in July 1989, and received a 180-day sentence, with 176 days suspended. Hoover was Krantz's probation counselor for this offense as well as the 1987 lewd conduct conviction.
When Krantz failed to appear for a meeting with Hoover, another bench warrant was issued. Krantz was arrested and the court required that he participate in sexual deviancy evaluation and treatment. He was arrested on the Bellevue bench warrant in November 1989 and jailed until January 1990. After his release from jail, he met with Hoover, who determined that Krantz required a high level of supervision. Krantz met with Hoover monthly as required, but failed for some time to make any progress in arranging for sexual deviancy treatment. Krantz did attend narcotics anonymous meetings sporadically. In May 1990, Krantz began sexual deviancy treatment with Timothy Smith, a sexual deviancy counselor. In June, Smith characterized Krantz as a "high risk offender" and recommended that he be "locked up for as long as possible" should he reoffend. CP at 41-42.
On June 20, 1990, Krantz admitted to Hoover that he had broken into the home of a nearby neighbor when she was not at home, masturbated, and had taken some of her underclothing. Hoover advised Krantz to turn himself in to the police, and relayed the information to the city attorney's office and the police. (These events led to the 1990 King County charges of sexually motivated burglary for which Krantz was on pretrial release at the time of the rape.)
Hoover recommended that Krantz's probation on the 1989 lewd conduct conviction be revoked. A hearing on the petition to revoke was held on July 30, 1990. At the hearing, Hoover informed the court that Krantz had used illegal drugs and that he had exposed himself several times while under supervision. Hoover also told the court about the burglary and that charges were being prepared. In addition, Hoover presented the court with Smith's July report, which explained *405 that Krantz was being terminated from the sexual deviancy program because of the burglary and his probation violations involving use of drugs and alcohol and engaging in deviant behavior.
Krantz submitted reports from Dr. Kenneth Von Cleve, a sexual deviancy psychologist, and Megan Kelley, who provides treatment for substance abuse, which stated that treatment could be provided to Krantz, although not if he was incarcerated. Von Cleve noted in his report that "[t]he most disturbing aspect of this case is the lack of monitoring that has been done." CP at 47. Based on the reports and recommendations for treatment, the court denied the petition to revoke probation and ordered Krantz to submit to alcohol treatment and sexual deviancy treatment with Von Cleve.
Krantz signed a release allowing Dr. Von Cleve to disclose information to Seattle Municipal Probation Services: "I hereby consent to a mutual exchange of information between Kenneth Von Cleve, Sid Hoover, Seattle Municipal Probation. The purposes of the disclosures are to provide referral information and to inform Seattle Municipal Probation of diagnosis, attendance and nonattendance, treatment issues, progress, prognosis and completion." CP at 76.
During the period of July 30, 1990, the date of the revocation hearing, and October 6, 1990, when Krantz raped S.A.H., Hoover scheduled only one face-to-face meeting with Krantz, and during the meeting told Krantz he would not see him again for six months. This decision was made according to the City's risk assessment plan. Hoover believed that Krantz was still at as great a risk to reoffend as he was when first placed on probation, however. Although Hoover said in a declaration that he received a call from Von Cleve in early August and Von Cleve told him Krantz was in sexual deviancy treatment and chemical dependency treatment, CP at 38, he also said in a deposition that he did not recall whether Von Cleve told him that any urinalysis tests had been done, CP at 498. Hoover also said in his declaration that in mid-September, when he did not receive a written report, he called Von Cleve, who verified that Krantz was in compliance with his probation conditions. CP at 38. Krantz said, however, that he saw Dr. Von Cleve only once between July 30 and October 6, and considered another man to have been his treatment provider. He did not recall having undergone any urinalysis testing. Krantz was using drugs and alcohol at least two weeks before the rape, and had consumed alcohol and cocaine on the night of the rape.
When the City moved for summary judgment, plaintiff submitted the affidavit of William T. Stough, an experienced state probation officer, who stated that in his opinion Hoover should have scheduled more face-to-face meetings after probation revocation was denied, and should have verified Krantz's participation in treatment and compliance with probation conditions. Stough said that Hoover should have scheduled a meeting earlier than the September 11, 1990, meeting which occurred, and opined that the delay communicated a lack of attention and lack of control to Krantz.
Turning to plaintiff's claim against the county, the King County Prosecuting Attorney filed charges against Krantz of burglary with a sexual motivation as a result of Krantz's entry into his neighbor's home. Krantz voluntarily appeared to answer the charges, pleaded not guilty, and was granted pretrial release under certain conditions, including evaluation for substance abuse, and refraining from use or possession of any nonprescribed controlled substances.
Krantz signed a supervised release agreement with King County pretrial release counselor Tyrone Lake. This contract contained provisions concerning court appearances, obedience to all laws, reporting to the Court Services Section at least three times weekly, notifying his counselor of any assignments or changes in court dates, securing of lawful employment approved by the counselor during the period of time he was "under supervision[,]" securing and maintaining a suitable residence, and supporting dependents and fulfilling financial obligations. CP at 453. The contract also required that Krantz would "actively cooperate and participate in any program established for me by the Court Services Section ... [and] to participate in *406 testing at the Unit and evaluations by clinical staff of the Unit or other agencies." Id. The contract required that Krantz not leave King County without written permission, that he possess no firearms, that he abstain from use of alcohol and nonprescribed drugs, and that he agree to submit to urinalysis and alcohol testing on the request of the counselor. Id. In addition, the contract provided Krantz would obtain alcohol/drug evaluation and follow all treatment recommendations.
During the time that Lake was Krantz's pretrial release counselor, Krantz checked in with him nearly daily by phone and they met face-to-face seven times. Krantz was employed. Lake did not actually know of any violations of conditions of Krantz's pretrial release, but he did not determine whether any testing for substance abuse occurred nor did he direct any such testing. As noted, there is evidence that Krantz was using drugs and alcohol at least two weeks before the rape. Also, plaintiff seeks discovery of treatment records which may disclose additional violations, if any, of pretrial release.
Stough's statement, offered in opposition to the County's motion for summary judgment as well as the City's, includes his opinion that Lake failed to adequately supervise Krantz because he did not verify participation in a drug and alcohol treatment program nor did he verify that Krantz followed treatment recommendations. Stough opined that Lake should have determined whether Krantz had submitted to regular and random urinalysis tests, and that only such tests could show whether Krantz was abstaining from drug and alcohol abuse as required.
As indicated, the trial court denied both the City's and the County's motions for summary judgment, and the Court of Appeals affirmed. Hertog v. City of Seattle, 88 Wash. App. 41, 943 P.2d 1153 (1997), review granted, 134 Wash.2d 1024, 958 P.2d 313 (1998). The trial court also denied plaintiff's motion to compel discovery of Von Cleve's and Megan's treatment records. The Court of Appeals reversed this ruling. Both the City and the County sought discretionary review, which this court granted.

ANALYSIS
As this matter is here for review of the trial court's denial of summary judgment, this court makes the same inquiry as the trial court, i.e., summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Taggart, 118 Wash.2d at 199, 822 P.2d 243; CR 56(c). The facts and reasonable inferences from the facts are considered in the light most favorable to the nonmoving party. Taggart, 118 Wash.2d at 199, 822 P.2d 243. Questions of law are reviewed de novo. Sherman v. State, 128 Wash.2d 164, 183, 905 P.2d 355 (1995).
Plaintiff alleges negligence on the part of the City and the County. The elements of a negligence cause of action are the existence of a duty to the plaintiff, breach of the duty, and injury to plaintiff proximately caused by the breach. Degel v. Majestic Mobile Manor, Inc., 129 Wash.2d 43, 48, 914 P.2d 728 (1996). Existence of a duty is a question of law. Schooley v. Pinch's Deli Market, Inc., 134 Wash.2d 468, 474, 951 P.2d 749 (1998). Breach and proximate cause are generally fact questions for the trier of fact. However, if reasonable minds could not differ, these factual questions may be determined as a matter of law. Sherman, 128 Wash.2d at 183, 905 P.2d 355.

Existence of Duty Owed by City Probation Counselors
The City maintains that it had no duty to protect S.A.H. from Krantz's dangerous propensities. In Taggart, 118 Wash.2d 195, 822 P.2d 243, we held that the state may be liable for the negligence of a parole officer who fails to use reasonable care in supervising a parolee whose dangerous propensities pose a reasonably foreseeable danger to others. This holding followed the decision in Petersen v. State, 100 Wash.2d 421, 671 P.2d 230 (1983). There, we determined that whether a person has a duty to control the conduct of third persons to prevent harm to others is assessed by standards set forth in the Restatement (Second) of Torts:
There is no duty so to control the conduct of a third person as to prevent him *407 from causing physical harm to another unless
(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
(b) a special relation exists between the actor and the other which gives to the other a right to protection.
Petersen, 100 Wash.2d at 426, 671 P.2d 230 (quoting Restatement (Second) of Torts § 315 (1965)). Section 315 states an exception to the common law rule that one has no duty to prevent a third party from causing harm to another. Taggart, 118 Wash.2d at 218, 822 P.2d 243. This special relation exception is also an exception to the public duty doctrine. Noting that the public duty doctrine was not addressed in Petersen, the court in Taggart stated that Petersen's imposition of liability on the state in that case presupposed that the doctrine was inapplicable, "in other words," Petersen "effectively created another exception to the doctrine, and it has been so regarded in later cases." Taggart, 118 Wash.2d at 219 n. 4, 822 P.2d 243 (citations to later cases omitted).
A duty will be imposed under Section 315 only where there is a "`definite, established and continuing relationship between the defendant and the third party.'" Taggart, 118 Wash.2d at 219, 822 P.2d 243 (quoting Honcoop v. State, 111 Wash.2d 182, 193, 759 P.2d 1188 (1988)). This relationship exists between a parole officer and his or her parolees as a result of RCW 72.04A.080, which provides that parolees are subject to supervision by the Department of Corrections and that parole officers are charged with preparing progress reports and guiding and supervising parolees "within the conditions of a parolee's release from custody." Taggart, 118 Wash.2d at 219, 822 P.2d 243.[3] Of several special relationships described in the Restatement (Second) of Torts, that described in § 319 is most relevant to parole officers and parolees:
One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.
Restatement (Second) of Torts § 319 (1965). A parole officer takes charge of the parolee because
[t]he State can regulate a parolee's movements within the state, require the parolee to report to a parole officer, impose special conditions such as refraining from using alcohol or undergoing drug rehabilitation or psychiatric treatment, and order the parolee not to possess firearms. The parole officer is the person through whom the State ensures that the parolee obeys the terms of his or her parole. Additionally, parole officers are, or should be, aware of their parolees' criminal histories, and monitor, or should monitor, their parolees' progress during parole.
Taggart, 118 Wash.2d at 220, 822 P.2d 243. In Taggart we specifically rejected the approach of some cases from other jurisdictions where courts had declined to find a duty on the part of parole officers because they do not have a custodial relationship with parolees. Id. at 222-23, 822 P.2d 243. Instead, we held "that a parole officer takes charge of the parolees he or she supervises despite the lack of a custodial or continuous relationship." Id. at 223, 822 P.2d 243.
While parole officers must perform "extremely difficult supervisory tasks," we said in Taggart that the duty announced there only arises after it has been shown the parole *408 officer lacks absolute immunity, i.e., the officer's actions were not part of any judicial or quasi-judicial process, and lacks qualified immunity, i.e., the officer failed to perform statutory duties according to procedures dictated by statute and superiors. Id. at 224, 822 P.2d 243.
Following Taggart, we held in Savage v. State, 127 Wash.2d 434, 899 P.2d 1270 (1995), that the qualified personal immunity for parole officers recognized in Taggart does not extend to the State. Thus, if the individual parole officer fails to take reasonable care to control his or her parolee, but nevertheless does so while acting in furtherance of a statutory duty and in substantial compliance with the directives of superiors and relevant regulatory guidelines, the parole officer enjoys qualified immunity, but that immunity does not run to the State. "[M]aintaining the potential of state liability, as established in RCW 4.92 [abrogation of sovereign immunity], can be expected to have the salutary effect of providing the State an incentive to ensure that reasonable care is used in fashioning guidelines and procedures for the supervision of parolees." Id. at 446, 899 P.2d 1270. Accordingly, following Savage, a determination that the individual officer has qualified personal immunity does not resolve the question of duty on the part of the employing governmental agency.
The City maintains that Taggart and Savage were wrongly decided and should be overruled because parole officers do not have any real control over the day to day lives and actions of parolees. However, this same argument was carefully considered and rejected in Taggart. Further, our decision in Taggart expressly stated that the Legislature could limit or eliminate the duty recognized there by passing legislation granting further immunity. Taggart, 118 Wash.2d at 224, 822 P.2d 243. The Legislature has not enacted such legislation.
Taggart is well-grounded in tort principles which apply equally to private and to governmental entities, in the absence of sovereign immunity. See RCW 4.92. Its foundations are the common law principles set forth in Petersen and the Restatement (Second) of Torts §§ 315, 319 (1965). Defendants have offered no persuasive argument for abandoning our analysis in Taggart. We decline to overrule Taggart or Savage.
In the alternative, the City argues that whatever justification there may be for the decisions in Taggart and Petersen, the same justification does not apply in this context. In Taggart, the City urges, the parole officers had the power to obtain full custodial control by arresting the paroleeauthority which a probation counselor lacks over a misdemeanant probationer. Here, the City argued, Hoover's authority only permits that he asks a municipal court judge to revoke probation.
We decline to make the distinction for which the City argues. First, Taggart does not state that the authority to arrest is a necessary requirement to the duty it announced. While the power to arrest enables a parole officer to take full custodial control, custodial control is not required. The relevant inquiry is the relationship of the officer with the parolee. A probation counselor is clearly in charge of monitoring the probationer to ensure that conditions of probation are being followed, and has a duty to report violations to the court.
Second, the fact that a probation counselor must seek revocation through a court does not preclude existence of duty, as Petersen illustrates. Petersen involved a negligence claim brought by a plaintiff who had been injured in an automobile accident where the other driver was a recently released state hospital psychiatric patient who was under the influence of drugs. The court held that a special relation exists between a state psychiatrist and his or her patient such that when the psychiatrist determines or should determine that the "patient presents a reasonably foreseeable risk of serious harm to others, the psychiatrist has `a duty to take reasonable precautions to protect anyone who might foreseeably be endangered.'" Taggart, 118 Wash.2d at 218-19, 822 P.2d 243 (quoting Petersen, 100 Wash.2d at 428, 671 P.2d 230). The psychiatrist in Petersen knew that the patient was a potentially dangerous person whose behavior was unpredictable and who was likely to have delusions and hallucinations from taking the illegal *409 drug angel dust, particularly if he stopped taking his prescribed medication. Petersen, 100 Wash.2d at 428, 671 P.2d 230. The psychiatrist also thought it likely that the patient would revert to using angel dust and was aware of the patient's reluctance to take the prescribed medication. Id. We concluded that the psychiatrist breached the duty owed, by failing to petition the court for a 90-day commitment or to take other reasonable precautions to protect those who might be foreseeably endangered by the patient's drug-related mental problems. Id. at 428-29, 671 P.2d 230.
The psychiatrist in Petersen had no authority to confine the patient without seeking a court order. Similar to the circumstances in Petersen, the fact that a probation counselor cannot act on his or her own to arrest a probationer or to revoke probation is not dispositive on the issue of duty.
The City suggests, though, that misdemeanants on probation cannot be said to pose the same risk of harm to the public as felons on parole. The issue is not whether misdemeanants as a class might pose an equal or lesser risk of harm than convicted felons. Instead, under § 319 the issue is whether a particular individual poses such a risk of harm.
Finally, the City maintains that plaintiff failed to identify any standard of conduct applicable to Hoover. However, Taggart identifies the standard of care as that set forth in Section 319 of the Restatement (Second) of Torts.[4]
We conclude that Taggart controls this case, and that the City and its probation counselors have a duty to control municipal court probationers to protect others from reasonably foreseeable harm resulting from the probationers' dangerous propensities.

Breach of Duty and Proximate Causation
The City maintains that under Petersen, Taggart, and Savage a parole officer or a probation counselor violates a duty only when they fail to seek to have the dangerous individual incarcerated. Here, the City maintains, Hoover sought to have Krantz's probation revoked and therefore met the standard of reasonable care as a matter of law. The City maintains there was nothing more that Hoover could have done.
Plaintiff contends that after the court declined to revoke Krantz's probation on July 30, 1990, the City completely abdicated its responsibility to continue to supervise Krantz. Hoover saw Krantz only once between the revocation hearing and the time Krantz committed the rape. Hoover stated this decision was made according to the City's risk assessment plan to put probationers on less strict probation status, but also said that Krantz was still at as great a risk of reoffending as when first put on probation. Further, at the single meeting, Hoover told Krantz he would not see him again for six months, which was, according to plaintiff, consistent with the City's internal rules which required that Krantz meet with his probation officer only once in the six months following the revocation hearing. Hoover did *410 not contact the King County pretrial release counselor to see if Krantz's use of drugs or alcohol had been checked by the County, nor, viewing the facts and inferences in a light most favorable to plaintiffs, did he determine whether Krantz was subjected to urinalysis or other drug or alcohol tests by the treatment providers. Krantz's prior offenses were linked to use of drugs and alcohol. Stough's affidavit supports plaintiff's claim that Hoover's supervision of Krantz was inadequate (as the Court of Appeals noted, there is nothing in the record showing that the City challenged Stough's affidavit).
Viewing the facts and reasonable inferences therefrom in the light most favorable to plaintiff, there remains a genuine issue of material fact as to whether Hoover or the City or both breached a duty to control Krantz so as to protect others from the risk of harm he posed. In this regard, as indicated, the trial court commented that Hoover enjoyed personal immunity. This conclusion is correct, insofar as Hoover acted in furtherance of a statutory duty and in substantial compliance with the directives of superiors and relevant regulatory guidelines. See Taggart, 118 Wash.2d at 216, 822 P.2d 243. However, if Hoover's actions do not meet this standard, then liability can be premised on his negligent failure to carry out his supervisory responsibilities. Even if Hoover is entitled to qualified personal immunity, however, under Savage the City may still be liable for failing to use reasonable care in fashioning guidelines and procedures for the supervision of probationers.
The next question is whether there is a fact issue as to proximate cause, which consists of cause in fact and legal causation. Taggart, 118 Wash.2d at 225-26, 822 P.2d 243; Hartley v. State, 103 Wash.2d 768, 777, 698 P.2d 77 (1985). Cause in fact concerns "but for" causation, events the act produced in a direct unbroken sequence which would not have resulted had the act not occurred. Taggart, 118 Wash.2d at 226, 822 P.2d 243; Hartley, 103 Wash.2d at 778, 698 P.2d 77. The City argues that based on the knowledge that he had, Hoover could have done nothing to prevent the rape. The City premises this argument on the fact that the record thus far shows that Krantz used drugs and alcohol for two weeks prior to the rape, and that had Hoover known of that substance abuse, there was inadequate time for a petition for revocation of probation to be effected. It should be added that the information that Krantz consumed drugs and alcohol during that period is shown by a presentence report prepared after the rape which Hoover could not have known about.
The Court of Appeals reasoned, however, that if Hoover had attempted to learn earlier whether monitoring by random urinalysis was being done and learned it was not, he could have sought revocation earlier. That court noted that treatment records of Dr. Von Cleve and Megan Kelley will clarify whether earlier violations occurred. Hertog, 88 Wash.App. at 57, 943 P.2d 1153. Thus, the court declined to hold that no issue of fact remains as to cause in fact. This conclusion is correct. As discussed below, we agree that the treatment records are discoverable. The records may show whether Krantz was in compliance with his probation conditions. Simply because Hoover sought revocation once does not mean that the duty to use reasonable care in supervision is forever satisfied. Further, the fact he did not actually know of probation violations does not answer the question whether he should have known of any such violations. Under Krantz's release agreement with Dr. Von Cleve, treatment and other information could be exchanged with Hoover, yet there is a material fact question as to whether Hoover sufficiently inquired about urinalysis or other testing.
Legal causation "rests on considerations of policy and common sense as to how far the defendant's responsibility for the consequences of its actions should extend." Taggart, 118 Wash.2d at 226, 822 P.2d 243; Hartley, 103 Wash.2d at 779, 698 P.2d 77. Legal causation is intertwined with the question of duty. Taggart, 118 Wash.2d at 226, 822 P.2d 243; Hartley, 103 Wash.2d at 779-80, 698 P.2d 77 (quoting William L. Prosser, Handbook of the Law of Torts 244-45 (4th ed.1971)). While the same policy considerations may be relevant to both elements, existence of a duty does not automatically *411 satisfy the requirement of legal causation, however. Schooley, 134 Wash.2d at 479, 951 P.2d 749.
Here, the City maintains that cases in which legal causation was found lacking are irreconcilable with the duty announced in Taggart. However, in none of the cases was the third party released to the supervision of a probation or parole officer, and in none was a special relationship found by the court. Johnson v. State, 68 Wash.App. 294, 841 P.2d 1254 (1992); Baumgart v. Grant County, 50 Wash.App. 671, 750 P.2d 271 (1988); Hartley, 103 Wash.2d 768, 698 P.2d 77. Keeping in mind that establishment of a duty does not resolve the proximate cause issue, there is nevertheless a distinction between circumstances where a special relationship is found and where none is found. Policy considerations involved in imposing the duty, such as the parole officer's taking charge of the parolee with the ability and responsibility to supervise the parolee, and the knowledge of the one taking charge of dangerous propensities posing a harm to others, also suggest that where such a relationship is not found, proximate causation may not be so readily found either. Where a special relation exists based upon taking charge of the third party, the ability and duty to control the third party indicate that defendant's actions in failing to meet that duty are not too remote to impose liability. See generally McCoy v. American Suzuki Motor Corp., 136 Wash.2d 350, 360, 961 P.2d 952 (1998). Accordingly, we do not find the cases irreconcilable.
Lastly, on this question, we perceive that the City's argument on legal causation essentially again asks for reversal of Taggart, which we decline to do.

Discovery of Treatment Records
The City contends that the Court of Appeals erred in holding that the treatment records of Dr. Von Cleve and Megan Kelley are discoverable, arguing that they are protected by the psychologist-client privilege. The City relies upon State v. Sullivan, 60 Wash.2d 214, 373 P.2d 474 (1962) for the proposition that treatment records are privileged even where a court orders a mental health evaluation with the expectation that the psychiatrist would also treat the defendant. The City also argues that in signing the release with Dr. Von Cleve Krantz waived the privilege only for the limited purpose of allowing mental health professionals to report to his probation counselor.
CR 26(b)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action...." (Emphasis added.) RCW 18.83.110 provides that "[c]onfidential communications between a client and a psychologist shall be privileged against compulsory disclosure to the same extent and subject to the same conditions as confidential communications between attorney and client...."
The Court of Appeals held that in light of the release signed by Krantz with Dr. Von Cleve, Krantz had no reasonable expectation that his communications with Von Cleve would remain confidential. The court said that "Krantz knew or reasonably should have known that his communications with Dr. Von Cleve and the records maintained by the psychologist would be used to monitor performance for probation purposes." Hertog, 88 Wash.App. at 49, 943 P.2d 1153. We agree.
"The psychologist-client privilege is not applicable when it is clear that the communications between the psychologist and the client are not intended to be confidential. J.N. v. Bellingham School Dist. No. 501, 74 Wash.App. 49, 871 P.2d 1106 (1994)." 4 Lewis H. Orland & Karl B. Tegland, Washington Practice: Rules Practice, 4 (4th ed. Supp. 1997). While the issue of whether information is privileged is a "harder case where the purpose of the communication is treatment," there is no expectation of confidentiality where the client is informed that there will be disclosure to a third party. State v. Warner, 125 Wash.2d 876, 892 n. 8, 889 P.2d 479 (1995).
Thus, regardless of whether treatment is at issue, the key is that the communications between Von Cleve and Krantz were not confidential because Krantz had signed a release agreeing to their disclosure to a third partyHoover and the City's probation department. *412 Sullivan, relied upon by the City, did not involve the same situation. Moreover, because the privilege did not attach in the first place, in that the communications were not confidential, there is no issue of waiver of the privilege. Therefore, we do not reach the City's argument that a limited waiver occurred.
The Court of Appeals reasoned that in light of the release, Krantz had no expectation of confidentiality as to Kelley's records, either. Because evaluation and treatment were imposed by the court as conditions of probation, and in light of Krantz's knowledge that treatment issues with Dr. Von Cleve would be disclosed, we agree that Krantz could not reasonably expect the communications with Kelley to remain confidential insofar as the statutory psychologist-client privilege is concerned. Moreover, as the Court of Appeals also correctly noted, the record does not establish that Kelley is a mental health professional within the meaning of the statutory privilege. The City has not responded to this observation.
RCW 70.96A.150 is also at issue. That statute pertains to records of alcoholics and intoxicated persons and states in relevant part that "[t]he registration and other records of treatment programs shall remain confidential. Records may be disclosed ... (b) if authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause...." RCW 70.96A.150(1). The Court of Appeals reasoned that "good cause" should be defined as for discovery purposes:
"`Good cause' for discovery is present if information sought is material to moving party's trial preparation. Such requirement for discovery and production of documents is ordinarily satisfied by a factual allegation showing that requested documents are necessary to establishment of the movant's claim or that denial of production would cause moving party hardship or injustice."
Hertog, 88 Wash.App. at 51, 943 P.2d 1153 (quoting Black's Law Dictionary 692 (6th ed.1990) (citations omitted)).
Where records of court-ordered treatment are sought under RCW 70.96A.150(1)(b) to establish civil liability for negligent supervision of probationers, we agree that "good cause" for discovery purposes satisfies the "good cause" requirement of the statute. In this case it may be crucial for plaintiff to show that Krantz did not comply with treatment conditions, because, if Krantz violated his probation, and if Hoover failed to adequately monitor compliance, then plaintiff may be able to show that Hoover failed to seek revocation at a time when revocation might have prevented the rape. Thus, the information in Kelley's records may well be necessary in establishing proximate cause.[5] We conclude good cause is established here.
Finally, we note that under CR 26(c) the trial court can, on motion of a party or the person from whom discovery is sought, for good cause shown, make any protective order which justice requires. This provision may have particular importance where alcohol treatment records are concerned.

Existence of Duty Owed By County Pretrial Release Counselor
The County maintains that it had no duty to control Krantz so as to protect others from reasonably foreseeable harm resulting from his dangerous propensities. The County urges that unlike the situations in Taggart and Savage, which concern postconviction felony parole releases, its alleged liability concerns a defendant on pretrial release with no prior felony conviction who is presumed innocent of the charges against him.
The County urges the Court to follow McKenna v. Edwards, 65 Wash.App. 905, 830 P.2d 385 (1992). There the Court of Appeals *413 observed that since Edwards had not been convicted, he was presumed innocent and had the right to be free pending arraignment under the least restrictive conditions possible. The court said the same was not true in Taggart, where the criminals were on supervised parole. McKenna, 65 Wash.App. at 916, 830 P.2d 385.
While true, the presumption of innocence does not determine whether a duty is owed. As Taggart demonstrates, the inquiry under §§ 315 and 319 of the Restatement (Second) of Torts does not depend upon conviction, but rather on the relationship between the actor and the person posing foreseeable harm. Absent a "definite, established and continuing" relationship between a pretrial release counselor and the releasee, no duty arises. Taggart, 118 Wash.2d at 219, 822 P.2d 243. The duty under § 319 does not arise, either, unless the actor knows or should know of the danger to others posed by the individual. Whether an individual has been found guilty of a particular crime may be a relevant consideration, but not necessarily a dispositive one, particularly where there is a history of prior conduct showing dangerous propensities. Further, with the abolishment of sovereign immunity, the County's liability exposure is the same as a private entity, and cases like Petersen demonstrate that liability for third party conduct does not turn on a criminal conviction. Thus, the presumption of innocence does not control the question of the County's duty.
The next question is whether quasi-judicial immunity shields the County. In Taggart, the court held that parole officers are entitled to absolute quasi-judicial immunity
only for those functions they perform that are an integral part of a judicial or quasi-judicial proceeding. Thus when a parole officer performs functions such as enforcing the conditions of parole or providing the [parole] Board with a report to assist the Board in determining whether to grant parole, the officer's actions are protected by quasi-judicial immunity. But when the officer takes purely supervisory or administrative actions, no such protection arises.
Taggart, 118 Wash.2d at 213, 822 P.2d 243.
The County contends that quasi-judicial immunity applies where a court-ordered pretrial release is concerned. To the extent that the County assisted with the decision to order pretrial release, this argument is clearly correct under Taggart. Thus, if the County or its employees made reports to assist the court in deciding to release Krantz, that conduct is protected by quasi-judicial immunity. The County maintains, though, that as Krantz's pretrial release counselor Lake merely acted as an arm of the court, and that he had authority only to monitor compliance with conditions and report any violations to the prosecuting attorney who could then seek revocation of pretrial release. The County relies heavily upon McKenna in support of its claim that Lake did not supervise Krantz.
In McKenna, Daniel Edwards was released on his own recognizance following his arrest on rape charges. His release was subject to conditions, including weekly contact with the corrections department, travel limitations, no possession of firearms or dangerous weapons, no contact with the victim, no consumption of alcohol, reporting to a treatment center for bi-weekly drug and alcohol monitoring, a 10 p.m. curfew, no consumption of nonprescribed drugs, no further criminal violations and residing with his parents. While on pretrial release, Edwards attended a "kegger" party, following which he shot one person and raped another.
In a negligence action filed by the rape victim and survivors of the shooting victim, the court addressed the issue whether Spokane County Corrections was shielded by judicial immunity for its investigation and recommendation to release Edwards, which the court answered in the affirmative. The court also addressed whether the treatment facility or Corrections had a relationship with Edwards such that either had a duty under §§ 315 and 319 of the Restatement (Second) of Torts to anticipate and control Edwards' conduct, and whether any duty was breached.
The court in McKenna reasoned that there was no order to supervise, no statute mandating *414 supervision, and no agreement to supervise. In addition, there was no special knowledge of dangerous propensities that would warrant imposition of a duty on Corrections or the treatment facility. McKenna, 65 Wash.App. at 916, 918, 830 P.2d 385. As to Corrections, the court said that its duty was limited to ensuring that Edwards report weekly to the department and reporting any violations of pretrial release to the prosecutor. Id. at 916-17, 830 P.2d 385. The court also concluded that Corrections had no knowledge that would warrant imposing a duty to control Edwards because nothing in his history suggested he would murder and rape. Id. at 917, 830 P.2d 385.
Unlike the situation in McKenna, here Krantz and Lake signed a supervised release contract which contained numerous conditions of release. Also, there is ample evidence that Lake knew or should have known that Krantz had a history of drug and alcohol abuse and sexual deviancy while abusing substances, that he was on probation for lewd conduct convictions in Seattle and Bellevue, and that the burglary for which he was on pretrial release was alleged to be sexually motivated. Lake also had received a copy of Dr. Von Cleve's report where Von Cleve expressed his opinion that Krantz required close monitoring. Thus, while Lake had no authority to arrest or impose conditions, he had, like the City's probation officer, the responsibility of monitoring Krantz for compliance with the conditions of his release. Accordingly, the County's reliance on McKenna is misplaced.[6]
Further, Taggart relied on cases which found no quasi-judicial immunity where probation officers failed to monitor compliance with conditions of probation or allowed the probationer to violate such conditions. Taggart, 118 Wash.2d at 211-12, 822 P.2d 243 (discussing A.L. v. Commonwealth, 402 Mass. 234, 521 N.E.2d 1017 (1988) and Acevedo v. Pima County Adult Probation Dep't, 142 Ariz. 319, 690 P.2d 38, 44 A.L.R.4th 631 (1984)). Thus, under Taggart, monitoring compliance with probation conditions is not protected by quasi-judicial immunity.
The County also maintains that if it has a duty to control Krantz, the effect will likely be that local governments would cease monitoring compliance with court imposed conditions of pretrial release, or would disclaim any supervisory control. The County additionally claims that in any case it is purely speculative whether any breach of conditions of pretrial release would result in court ordered incarceration thus preventing further criminal conduct. We will not speculate as to the local governments' and the legal and political systems' responses to imposition of a duty, nor will we deny potential liability on the basis that plaintiffs may have difficulty in proving their cases. Such concerns must be addressed to the Legislature which has the authority to limit government liability.
We find no reason why the analysis in Taggart should not apply where a pretrial release counselor acts in a supervisory capacity. Plaintiff has alleged sufficient facts that Lake acted in a supervisory capacity.
The remaining question is whether there is a genuine issue of material fact as to whether any duty was breached. As the County points out, Krantz checked in nearly daily by phone, and during the 29 days that Lake monitored Krantz they had 7 face-to-face meetings. Lake was not aware of any violations of Krantz's conditional release, and he referred the matter to the prosecutor's office when he learned of the rape. On the other hand, as plaintiff urges, the County administered no urinalysis tests nor confirmed that Krantz's treatment providers administered any test. Given Lake's knowledge *415 of Krantz's history of substance abuse and sexual deviancy, and the conditions of supervised release that Krantz abstain from use of alcohol and nonprescribed drugs, as well as obtain alcohol and drug evaluation and follow treatment recommendations, there is an issue of fact as to whether Lake breached a duty to control Krantz.
Similar to the situation with the City and its probation counselor, Lake may be protected by qualified personal immunity for some or all of his actions, depending upon whether he acted in furtherance of any statutory obligations and in substantial compliance with directives of supervisors and relevant regulations. Any such immunity does not run to the County, however, which may be liable for failure to use reasonable care in its directives and regulations.
We hold that the County and pretrial release counselor Lake had a duty to control Krantz to protect others from reasonably foreseeable harm resulting from Krantz's dangerous propensities.

Conclusion
We hold that municipal probation counselors, county pretrial release counselors who have supervisory authority, and their employing agencies have a duty to protect others from reasonably foreseeable danger resulting from the dangerous propensities of probationers and pretrial releasees under their supervision. The Court of Appeals is affirmed.
SMITH, JOHNSON, SANDERS, JJ., and DOLLIVER, J.P.T., concur.
TALMADGE, J. (concurring).
I concur because we are bound by our precedents, Taggart v. State, 118 Wash.2d 195, 822 P.2d 243 (1992), and Savage v. State, 127 Wash.2d 434, 899 P.2d 1270 (1995).[1] While I am compelled to agree with the majority's disposition of the issues in this case, I feel compelled to comment on the policy rationale for the majority's decision. I agree completely with the concurring opinion of Judge Agid in the Court of Appeals. Judge Agid wrote of Petersen and Taggart:
I continue to believe those decisions ignore the reality of what officials exercising the cursory supervision permitted by state and local law can do to "control" the behavior of dangerous or, as here, potentially dangerous criminals. The huge caseloads and limited resources available to supervising city, county and state officials simply do not permit them to keep track of, much less control, every potentially dangerous defendant.
Hertog v. City of Seattle, 88 Wash.App. 41, 63, 943 P.2d 1153 (1997) (Agid, J., concurring). These tragic cases result in what may well approximate strict liability for cities, counties, and the State. Even if every prescribed supervisory step is followed, if a released person harms someone there may always be a claim for ineffective supervision. Such claims will rarely be susceptible to summary judgment because of the fact-intensive inquiry the claim requires. Nor in the case of pretrial supervision do the authorities even have the option of confining potentially dangerous persons. As Judge Agid noted, local officials cannot ignore the basic tenet of our criminal justice system that a defendant is presumed innocent. Id.
Our decisions in this area, such as Taggart and Savage, however well intentioned, are based on the exercise of 20/20 hindsight. We have imposed liability in retrospect when a release decision about a pretrial detainee, probationer, or parolee resulted in terrible consequences to a third person. But release decisions simply cannot be made with great precision. To the extent our case law may create what amounts to strict liability for ultimately unfortunate release decisions, the natural consequence will be that local governments will choose to end misdemeanor probation and/or any pretrial detention conditions rather than run the risk of extraordinary damage awards should they fail to foretell an individual will cause harm.
*416 Although Judge Agid asked us to reconsider our precedents, I believe the proper arena for reform is the Legislature. This situation cries out for legislative attention. Only the Legislature can properly balance legitimate concerns about public safety, the existence of liability should a released person cause harm to others, and the operation of pretrial release programs, probation services, and post-conviction community supervision programs operated by State and local government. A policy balance must be struck and it should be struck in the legislative process rather than here.
The majority correctly applies the law, but the Legislature should take this opportunity to examine issues of pretrial release, probation, and post-conviction community supervision to strike the appropriate balance among public safety, liability, and the public policy behind such programs if it wishes those programs to continue at all.
ALEXANDER, J. (concurring/dissenting).
The majority concludes that the City of Seattle and its probation counselors "have a duty to control municipal court probationers" in order "to protect others from reasonably foreseeable harm resulting from the probationers' dangerous propensities." Majority op. at 409. With that determination I agree.
I part company with the majority, however, insofar as it holds that King County and its pretrial release counselor, Tyrone Lake, had a similar duty to control Barry Lee Krantz so as to protect others from reasonably foreseeable harm. In my view, the ability of King County pretrial release counselors, like Lake, to control persons under their supervision is so lacking that policy considerations dictate a conclusion that they have no duty to protect third persons from being harmed by persons whom they are monitoring for the court.
While the majority properly relied upon Taggart v. State, 118 Wash.2d 195, 822 P.2d 243 (1992), as support for finding a duty on the part of municipal court probation officers, it is not authority that lends itself to an analysis of pretrial release programs. I reach that conclusion because a pretrial release program, such as the one operated by King County, is substantially different from the probation program operated by the City of Seattle or the parole supervision program that we examined in Taggart. One notable difference is that the pretrial release program deals only with persons who have been charged with a crime. Such persons are presumed innocent, and in most cases have a right to be released from custody pending trial under the "least restrictive ... conditions." CrRLJ 3.2. Are we, as Judge Agid observed in her concurring opinion at the Court of Appeals, to ignore this "basic tenet of our criminal justice system" and hold that the government owes a duty to protect others from persons who are merely charged with a crime? Hertog v. City of Seattle, 88 Wash.App. 41, 63, 943 P.2d 1153 (1997) (Agid, J., concurring), review granted, 134 Wash.2d 1024, 958 P.2d 313 (1998). In my view, we should not. The majority sweeps this concern aside and concludes that the presumption of innocence, by itself, does not bear on whether a duty is owed to third parties by pretrial release counselors. It instead focuses on "the relationship between the actor and the person posing foreseeable harm." Majority op. at 413. This ignores the fact that the presumption of innocence is fundamental in determining the relationship between a defendant and a pretrial release counselor. The right to be free pending trial, subject to limited control by the court, is fundamental, and it makes little sense for this court to hold that a pretrial release counselor owes a duty to persons that a defendant may injure during the time he or she is awaiting trial.
The most significant difference between the pretrial release program of King County and probation or parole supervision is that the pretrial release counselors, unlike probation officers, have very little control over defendants. Their ability to control persons on their caseload is so slight it cannot be said that their role is supervisory in the sense that we found significant in Taggart. These counselors, unlike probation or parole officers, are not authorized to arrest the people on their caseload nor can they impose conditions of release. In short, they simply do not, in the words of the Restatement of *417 Torts, "take[] charge" of persons on their caseload to the degree that liability should be imposed on them if the person they are monitoring harms someone. RESTATEMENT (SECOND) OF TORTS § 319 (1965).
The majority, while acknowledging that King County's pretrial release counselor had no authority to arrest or impose conditions on Krantz, notes that the counselor was responsible for monitoring Krantz to assure compliance with the conditions of release that had been established by the judge. Monitoring a pretrial releasee is not the same as exercising supervisory control over that person. The individual who monitors a pretrial releasee can only report violations of the conditions of release to the judge who ordered the release of the defendant. The decision about what should be done in the event of violations of the conditions of release lies with the judge and is not within the direct control of the pretrial release officer. It does not seem appropriate, therefore, to hold that mere monitoring of compliance with court ordered conditions, when the defendant essentially has a right to be free pending trial, is a relationship that creates a duty to protect third parties from harm that may result from the dangerous propensities of a releasee. In this respect, I find the sound reasoning of the Court of Appeals in Metlow v. Spokane Alcoholic Rehabilitation Ctr., Inc., 55 Wash.App. 845, 781 P.2d 498 (1989), review denied, 114 Wash.2d 1007, 788 P.2d 1079 (1990), instructive. There, the court affirmed a summary judgment in favor of a treatment center that had been treating an accused drunk driver who was undergoing treatment as a condition of deferred prosecution. The court reasoned that because the treatment center did not have "custodial control of [the driver]" nor could it restrict the driver's activities in any way, it owed no duty to a plaintiff who suffered injury at the hands of the accused. Metlow, 55 Wash.App. at 850, 781 P.2d 498.
Finally, it would be my view that the pretrial release officer and his employer, King County, are entitled to quasi-judicial immunity from liability. That was the conclusion the Court of Appeals reached in a similar case, McKenna v. Edwards, 65 Wash.App. 905, 912, 830 P.2d 385, review denied, 120 Wash.2d 1003, 838 P.2d 1143 (1992). There a corrections officer recommended to the Spokane County Superior Court that a defendant be released pending trial on certain conditions. After his release, the defendant, Edwards, committed a murder and a rape. The victims of those crimes then sued Spokane County for negligent supervision of Edwards. The Court of Appeals affirmed a summary judgment in favor of the County's pretrial release programs, concluding that because the officer was acting only as an "arm of the court" when he made his investigation and recommendation to the court, he was performing functions traditionally performed by the court, and, therefore, should be clothed with judicial immunity. McKenna, 65 Wash.App. at 912, 830 P.2d 385. With that conclusion I agree.
Because the majority does not differentiate between pretrial release and post-conviction probation, and extends our holding in Taggart to include pretrial supervision, I dissent.
GUY, C.J., and DURHAM, J., concur.
NOTES
[1] Hertog was substituted as guardian ad litem after the complaint was filed.
[2] The City contends that the complaint alleges that the City is liable only under a theory of respondeat superior, and that accordingly any immunity which Hoover enjoys also applies to bar City liability. Contrary to the City's contention, however, the complaint sufficiently alleges negligent supervision by the City as well as a respondeat superior theory.
[3] The duty does not derive from the statute. Rather, the statute describes the relationship, and "is sufficient to establish that parole officers have a `definite, established and continuing relationship' with their parolees." Taggart v. State, 118 Wash.2d 195, 219, 822 P.2d 243 (1992) (quoting Honcoop v. State, 111 Wash.2d 182, 193, 759 P.2d 1188 (1988)). Although a statute defined the parole officer-parolee relationship in Taggart, the court did not hold that a special relationship must be defined by statute. For example, the court noted that in Semler v. Psychiatric Inst., 538 F.2d 121 (4th Cir.1976), a special relationship arose between the defendants, a probation officer and a psychiatric institution, and the probationer as a result of a court order requiring that the probationer be confined and supervised as a day-care patient. Taggart, 118 Wash.2d at 220-21, 822 P.2d 243. The Restatement (Second) of Torts sections describing a duty where a special relationship exists do not require that a statute create the special relationship.
[4] The City also maintains that the trial court found that Hoover was not negligent at the ministerial level, but erroneously refused to recognize the City was protected by discretionary immunity for setting policy.

The City is mistaken in two respects. The trial court did not say that Hoover was not negligent at the ministerial level, but instead said that Hoover had personal immunity. A determination that Hoover has qualified personal immunity for at least some of his actions would mean that as to those actions he acted in accord with applicable regulations and directives. However, the actions could still fail to conform to the standard of reasonable care set forth in section 319 of the Restatement (Second) of Torts if applicable directives and regulations are deficient. If so, Hoover would enjoy qualified personal immunity but the City would not. Thus, saying that Hoover had personal immunity, which is what the trial court said, is not the same as saying that reasonable care was exercised in supervising Krantz.
The second mistake the City makes is that Savage is not concerned with discretionary policy making, insofar as the exception to waiver of sovereign immunity is concerned. Instead, Savage is concerned with "fashioning guidelines and procedures for the supervision of parolees" and this kind of agency level decisionmaking does not enjoy discretionary immunity. Savage v. State, 127 Wash.2d 434, 446, 899 P.2d 1270 (1995). Nor, as noted, is the City entitled to the benefit of any qualified personal immunity enjoyed by the probation counselor. In context, it is clear this is the point the trial court was making.
[5] The Court of Appeals held that because the records sought are relevant to the subject matter of the litigation and reasonably calculated to lead to the discovery of admissible evidence, good cause has been shown. Although the result is correct, we do not adopt this reasoning because this standard appears to be essentially the same as the standard for any discovery under CR 26(b)(1). This standard is, in any event, inconsistent with the definition of "good cause" the Court of Appeals adopted.
[6] The County additionally relies upon Metlow v. Spokane Alcoholic Rehabilitation Ctr., Inc., 55 Wash.App. 845, 781 P.2d 498 (1989), where the court held that a private alcohol rehabilitation center which contracted to provide nonresidential treatment to DWI defendants in the state's deferred prosecution program had no duty to protect third persons from a program participant's driving while intoxicated. Metlow is clearly distinguishable, however. The court there held that no special relation existed because the rehabilitation center did not have custodial control over the participant. Id. at 850, 781 P.2d 498 (distinguishing Petersen). Metlow was decided before Taggart, and did not consider the holding there that a custodial relationship is not a requirement of a duty under §§ 315 and 319 of the Restatement (Second) of Torts.
[1] The majority suggests the holding in Petersen v. State, 100 Wash.2d 421, 671 P.2d 230 (1983), also controls. However, the Legislature statutorily abrogated our holding in Petersen in Laws of 1987, ch. 212, § 301(1) (codified at RCW 71.05.120(1)), with respect to the liability of the State.